[Cite as *D.M. v. C.S.S.*, 2026-Ohio-3137.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY

| | | |
|---|---|---|
| D.M. | : | |
| | : | C.A. No. 2026-CA-8 |
| Appellant | : | |
| | : | Trial Court Case No. 26 DV 25 |
| v. | : | |
| | : | (Appeal from Common Pleas Court- |
| C.S.S. | : | Domestic Relations) |
| | : | |
| Appellee | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on August 14, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately send a copy of the court's ruling to each party and note that action on the docket. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Mary K. Huffman*

———————————————————
MARY K. HUFFMAN, JUDGE

TUCKER, J., and EPLEY, J., concur.

BRYAN K. BONAR and ZACHARY LEMASTER, Attorneys for Appellant
AMELIA K. RUDE, Attorney for Appellee

HUFFMAN, J.

{¶ 1} Petitioner-appellant, D.M., appeals from the trial court's judgment modifying the terms of a magistrate's order on a domestic violence civil protection petition ("DVCPO") granted in her favor against respondent-appellee, C.S.S. According to D.M., the trial court erred by refusing to allow a U.S. Citizenship and Immigration Services ("USCIS") Form I-864 (affidavit of support), which is required by the Immigration and Naturalization Act and 8 U.S.C. 1181 et seq. in immigration cases involving alien fiancés, to be applied in a civil protection order and in failing to grant other requested relief. While we agree with D.M. that Form I-864 can be considered by the trial court in DVCPO cases, we cannot say that the trial court abused its discretion in modifying the terms of the DVCPO in this case. For the reasons outlined below, we affirm the judgment of the trial court.

## I. Background Facts and Procedural History

{¶ 2} D.M. is a citizen of Egypt and entered the United States in October 2024 on a K-1 visa, which allows a foreign-citizen fiancée of a U.S. citizen to travel to the U.S. to marry their sponsor. As part of the immigration process, C.S.S. agreed to be responsible for D.M.'s financial support and executed a USCIS Form I-864 as required by the Immigration and Naturalization Act and 8 U.S.C. 1181 et seq.

{¶ 3} According to D.M., after the parties were married, C.S.S. allegedly started yelling at and verbally abusing D.M. The abuse eventually escalated to physical violence

when he pushed her and hit her in the mouth because she had turned down the volume on the radio without his permission.

{¶ 4} On January 30, 2026, D.M. filed a petition for a DVCPO against C.S.S., seeking a protection order and financial support based on the Form I-864 signed by C.S.S, as well as other relief. The matter proceeded to an ex parte hearing before the magistrate. During the hearing, D.M. testified that she believed she was in physical danger because C.S.S. had attempted to beat her on two occasions and that she was afraid of what his reaction may be when she filed for divorce. The magistrate entered an emergency order ordering C.S.S. to vacate the marital residence, to provide D.M. with a house key, and to have no contact with D.M.

{¶ 5} The initial full hearing on the matter proceeded on February 5, 2026. During the hearing, D.M.'s counsel sought housing and financial support for D.M. and pointed out that C.S.S. had signed Form I-864, which obligated C.S.S. to provide D.M. with financial support. C.S.S. did not dispute that he had signed the form but was not represented by counsel at the hearing, so the magistrate continued the hearing until C.S.S. could obtain an attorney to represent him. The magistrate entered a temporary support order ordering C.S.S. to pay the mortgage on the marital residence (where D.M. was living alone), all utilities on the home, and $150.00 per week to D.M. until the next hearing.

{¶ 6} The full hearing occurred on February 18, 2026, and both parties were represented by counsel. At the hearing, the parties entered into a consent agreement to the DVCPO and stipulated to a temporary spousal support order as part of the consent agreement, in which C.S.S. agreed to pay $1,662.50 of monthly spousal support to D.M. to comply with his financial support obligation under Form I-864. C.S.S. also agreed to pay D.M.'s first month's rent and security deposit on a rental when she exited the marital

3

residence and to continue paying her $150.00 per week during her first month in the rental, with those payments terminating once the spousal support payment commenced in the month following her marital residence move-out date.

{¶ 7} D.M.'s attorney, however, maintained that, because D.M. was in the U.S. on a K-1 visa, she was not eligible for public assistance, was unable to become a public charge, and lacked a work permit because of her immigration status. For these reasons, he argued that D.M. also needed (1) $500.00 for moving expenses and utility deposits because she had no credit history and thus was unable to obtain utilities in her name without additional deposits; (2) bedroom furniture from the spare bedroom in the marital residence; (3) medical insurance; and (4) cable television. With respect to D.M.'s additional four requests, C.S.S.'s attorney argued that once D.M. moved out of the marital residence, C.S.S. should provide nothing beyond what the parties had agreed to in the consent agreement because the additional requests were excessive, potentially placing D.M. in a better financial situation than C.S.S. The magistrate advised the parties that she would issue a written decision with respect to the four disputed terms.

{¶ 8} On February 27, 2026, the magistrate issued a decision and order of protection. The protection order was effective for a period of three years and granted D.M. exclusive use of the marital residence until May 1, 2026. Pursuant to the terms of the consent agreement, during that time, C.S.S. was ordered to pay all regular household bills and to provide D.M. with $150 per week. The magistrate ordered that, after May 1, C.S.S. was to have exclusive control of the marital residence and to pay spousal support to D.M. in the amount of $1,662.50 per month (totaling $19,950.00 per year) as provided in the consent agreement and required by Form I-864. With respect to the four contested terms, the magistrate ordered C.S.S. to pay $500 toward D.M.'s moving expenses and her utility

4

deposits, as well as her first month's rent and security deposit, reasoning that the additional $500 and utility deposits were necessary for the provision of suitable alternative housing. The magistrate noted that D.M. had no ability to earn income and that the interim support order of $150 per week was inadequate to facilitate her move. The magistrate next found that it was fair and equitable to require C.S.S. to provide health insurance to D.M. through his employer or the Affordable Care Act marketplace for the duration of the DVCPO because D.M. had no medical insurance and did not qualify for Medicaid, and it was in the best interests of both parties for D.M. to be insured because any medical bills incurred during the marriage would be considered marital debt. The magistrate then stated that the court had the ability to apportion personal property in a DVCPO and granted a bed from C.S.S. to D.M. for the three-year term of the DVCPO. Finally, the magistrate denied C.S.S.'s request to stop paying for cable in the marital residence, as that was a bill that he would have paid if he were living there.

{¶ 9} The magistrate's decision concluded with the following notice:

*A party may file written objections to this Order within fourteen days of its filing*, pursuant to Civ.R. 65.1(F)(3)(d), and must do so prior to filing an appeal. The timely filing of objections shall not stay the execution of this Order.

{¶ 10} On March 2, 2026, C.S.S. objected to the magistrate's decision. He argued that the magistrate's orders on the four contested terms were unreasonable considering the financial support already provided to D.M. in the consent agreement, and the magistrate had thus abused her discretion. C.S.S. did not deny that he had a duty to support D.M. due to his signing Form I-864. However, he argued that his duty to support D.M. was satisfied by the $19,950.00 annual payment and that while R.C. 3113.31(E)(1)(e) allowed the magistrate to order C.S.S. to maintain support, the statute did not create new obligations of support,

5

such as moving expenses, utility deposits, or health insurance. He also argued that although R.C. 3113.31(E)(1)(h) allowed for the apportionment of household and family personal property, it was unreasonable to disenfranchise him of his premarital bedroom furniture. Lastly, he argued that the continued use of cable television in the home was neither a support obligation nor relevant to D.M.'s wellbeing, and the magistrate had thus abused her discretion by ordering C.S.S. to continue paying for cable.

{¶ 11} On March 30, 2026, the trial court sustained C.S.S.'s objections in part and modified the magistrate's decision, reasoning that "while Form I-864 created a binding contract to pay support, the enforcement of that contract is not properly litigated as part of a protection order." The court reversed the magistrate's decision granting (1) $500 in moving expenses plus utility deposits; (2) a bed for D.M. to sleep on; and (3) payment of the monthly cable bill. The court stated that C.S.S. had satisfied his contractual obligation under Form I-864 by agreeing to pay 125% of the federal poverty guideline as part of the parties' consent agreement. The court also noted that C.S.S. had agreed to provide D.M. with housing and household expenses through May 1, 2026 (as D.M. remained in the marital residence); $150.00 per week in cash support while she was living in the home; and the first month's rent and security deposit for an apartment. The court opined that though the magistrate's order to pay the cable bill, to provide bedroom furniture, and to pay $500 in moving expenses plus utility deposits was arguably permitted under R.C. 3113.31(E)(1)(e) and (h), those requests were not necessary to protect D.M. from future harm of domestic violence, and thus there was no appropriate nexus. The court also modified the magistrate's order regarding health insurance, requiring C.S.S. to provide D.M. with health insurance for a period of only twelve months rather than the three-year term of the DVCPO.

6

**{¶ 12}** D.M. timely appealed the trial court's decision modifying the terms of the DVCPO.

## II. The DVCPO Statute

**{¶ 13}** R.C. 3113.31 governs domestic violence civil protection orders and provides victims with a pathway to petition the court for formal protection, emergency support, and safety orders against a family or household member who has perpetrated domestic violence against them. The statute describes the requirements and procedures for obtaining a DVCPO. Under R.C. 3113.31(E)(1), a court may grant a DVCPO to bring about a cessation of domestic violence against family or household members if the "petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence." *Felton v. Felton,* 1997-Ohio-302, paragraph two of the syllabus.

**{¶ 14}** The trial court can require the respondent to provide financial support in a DVCPO under R.C. 3113.31(E)(1)(e) if the respondent has a duty to support the petitioner or customarily contributes to the household. The trial court also has jurisdiction over all proceedings under the statute and may hold an ex parte and full hearing before granting a protection order or approving a consent agreement to bring about a cessation of the domestic violence. R.C. 3113.31(B) and (E)(1). "After such hearing, the court may issue a protection order that may direct the respondent to refrain from abusing the family or household members, grant possession of the household to the petitioner to the exclusion of the respondent, temporarily allocate parental rights and responsibilities and visitation rights, require the respondent to maintain support, require all parties to seek counseling, require the respondent to refrain from entering the residence, school, business, or place of

7

employment of the petitioner, and grant any other relief that the court considers equitable and fair." *Felton* at ¶ 12, citing R.C. 3113.31(E)(1).

### III. Civ.R. 65.1

{¶ 15} Before we address D.M.'s assignment of error, we recognize that the notice in the magistrate's decision permitting a party to file objections to the magistrate's order within fourteen days was in error.

{¶ 16} Civ.R. 65.1 pertains to civil protection orders and "provides a more streamlined procedure designed 'to expedite the process for obtaining a protection order after a full hearing . . . .'" *Durastanti v. Durastanti*, 2020-Ohio-4687, ¶ 13 (1st Dist.), quoting *M.D. v. M.D.*, 2018-Ohio-4218, ¶ 48 (8th Dist.). The statute specifically applies to special statutory proceedings under R.C. 3113.31 relating to domestic violence protection orders. *See* Civ.R. 65.1(A). "[T]he streamlined review process for magistrate decisions under Civ.R. 65.1(F) emerged out of a belief that Civ.R. 53's 'independent review by the court of magistrate "decisions" rendered after hearing, and . . . objections' was 'incompatible' with the goal of expediting civil protection order proceedings." *Durastanti* at ¶ 13, quoting 2012 Staff Note, Civ.R. 65.1(F).

{¶ 17} When special statutory proceedings under R.C. 3113.31 are referred to a magistrate for full hearing and determination, "[t]he magistrate shall conduct the full hearing and, upon conclusion of the hearing, deny or grant a protection order." Civ.R. 65.1(F)(3)(a). "A magistrate's denial or granting of a protection order after a full hearing shall comply with the statutory requirements relating to such orders and is not effective unless adopted by the court." Civ.R. 65.1(F)(3)(c)(i). "When a magistrate has denied or granted a protection order after a full hearing, the court may adopt the magistrate's denial or granting of the protection order upon review of the order and a determination that there is no error of law or other

8

defect evident on the face of the order." Civ.R. 65.1(F)(3)(c)(ii). In other words, the trial court's pre-objection review of a magistrate's decision is limited to "a determination that there is no error of law or other defect evident on the face of the order," after which the court may adopt, modify, or reject the order. *Durastanti* at ¶ 14, citing Civ.R. 65.1(F)(3)(c)(ii) and (iii). *"[A] party may not object to the magistrate's grant or denial of a protection order under Civ.R. 65.1." Insa v. Insa*, 2016-Ohio-7425, ¶ 26 (2d Dist.), quoting *Heimann v. Heekin*, 2014-Ohio-4276, ¶ 7 (1st Dist.).

{¶ 18} After the trial court has adopted, modified, or rejected the magistrate's denial or granting of a protection order, a party may file written objections to the trial court's order, or any terms of the order, within 14 days. Civ.R. 65.1(F)(3)(d)(i). A party filing objections to the trial court's order has an affirmative burden under Civ.R. 65.1(F)(3)(d)(iii) to show (1) "that an error of law or other defect is evident on the face of the order"; (2) "that the credible evidence of record is insufficient to support the granting or denial of the protection order"; or (3) "that the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order."

{¶ 19} Here, though C.S.S. was not permitted under Civ.R. 65.1(F)(3)(d) to object to the magistrate's decision granting the protection order until after the trial court had adopted, modified, or rejected the order, the magistrate's decision incorrectly invited him to object within 14 days. C.S.S. then objected to the magistrate's decision before the trial court had adopted, modified, or rejected the order, and the trial court prematurely ruled on those objections. Even so, neither party raised this issue on appeal, and we proceed with our analysis of D.M.'s assignment of error.

9

**IV. Assignment of Error**

**{¶ 20}** In her sole assignment of error, D.M. states:

In the decision on March 30, 2026, the trial court erred to the prejudice of petitioner-appellant by refusing to allow the immigration affidavit of support, the I-864, to be applied in a civil protection order, which overruled the magistrate's decision.

*Standard of Review*

**{¶ 21}** When the question on appeal is whether a civil protection order should have been granted at all, our standard of review is whether the petitioner has shown by a preponderance of the evidence that the petitioner was entitled to relief. *Young v. Young*, 2006-Ohio-978, ¶ 20 (2d Dist.), quoting *Felton,* 1997-Ohio-302, at paragraph two of the syllabus. On the other hand, if the scope and terms of a protection order are at issue, we review for an abuse of discretion because R.C. 3113.31 expressly authorizes the trial court to craft protection orders that are tailored to the particular circumstances of the case. *Id*. Because D.M. challenges the scope and terms of the DVCPO, we follow the latter standard in our review.

*Form I-864 (Affidavit of Support)*

**{¶ 22}** USCIS is part of the Department of Homeland Security and is responsible for processing immigration and naturalization applications and establishing policies regarding immigration services. If a U.S. citizen seeks to sponsor an immigrant to the U.S., he or she must submit a USCIS Form I-864, which is used to prove that the immigrant has adequate financial support and will not become a "public charge." *See* 8 U.S.C. 1183a. The affidavit of support obligates the sponsor to guarantee support for the intending immigrant at a level of no less than 125% of the Department of Health and Human Services Poverty Guidelines.

10

*See id*. It is a legally enforceable contract between the sponsor and both the U.S. government and the sponsored immigrant to ensure that the immigrant does not rely on public assistance. *See Schwartz v. Schwartz*, 2005 WL 1242171 (W.D.Okla. May 10, 2005). "[S]tate and federal courts have concurrent jurisdiction over enforcement of an I-864 support obligation." *Motlagh v. Motlagh*, 2017-Ohio-8667, ¶ 23 (2d Dist.).

{¶ 23} The sponsored immigrant may seek enforcement of the sponsor's obligations under Form I-864 through an appropriate action. Once the sponsor's support obligation commences, the support obligation does not terminate until the sponsor dies or the sponsored immigrant: (1) becomes a citizen of the United States; (2) has worked or can be credited with 40 qualifying quarters of work under title II of the Social Security Act; (3) ceases to be a lawful permanent resident and departs the United States; (4) obtains in a removal proceeding a grant of adjustment of status as relief from removal; or (5) dies. 8 C.F.R. 213a.2(e)(2)(i) and (ii). Divorce does not terminate the obligation. *Erler v. Erler*, 824 F.3d 1173, 1177 (9th Cir. 2016).

{¶ 24} The purpose of 8 U.S.C. 1183a and Form I-864 is to ensure that legal residents do not have to depend on public benefits for their support. *Nasir v. Shah*, 2012 WL 4342986 (S.D.Ohio Sept. 21, 2012), citing 8 C.F.R. 213a.2(c)(2). "[I]rrespective of how the I-864 support obligation is enforced, the ordered support must be sufficient so that the obligee's income meets 125% of the federal poverty line requirement." *Motlagh* at ¶ 14.

*Analysis*

{¶ 25} In this appeal from the trial court's decision regarding the terms of the DVCPO granted by the magistrate, we consider whether the trial court erred in sustaining C.S.S.'s objections and modifying the magistrate's order. D.M. argues that the trial court erred by

stating that, "while Form I-864 created a binding contract to pay support, the enforcement of that contract was not properly litigated as part of a protection order."

{¶ 26} As explained above, R.C. 3113.31(E)(1)(e) provides that a DVCPO order or agreement may require the respondent to maintain support if the respondent customarily provides for or contributes to the support of the family or household member, or if the respondent has a duty to support the petitioner or family or household member. Ohio courts have not previously determined whether support under Form I-864 can be ordered in an action for a domestic violence civil protection order, and thus this is a case of first impression.

{¶ 27} We want to be clear that the trial court, in fact, had jurisdiction to consider C.S.S.'s financial obligations under I-864 when deciding the terms of the protection order, and we believe that our conclusion is a natural extension of divorce case law involving the application of Form I-864 in determining spousal support. "Courts have typically interpreted the statute as permitting a sponsored immigrant to seek enforcement of the affidavit in divorce actions." *Motlagh*, 2017-Ohio-8667, at ¶ 9 (2d Dist.), citing *Davis v. Davis*, 2004-Ohio-6892 (6th Dist.), *Davis v. U.S.*, 499 F.3d 590 (6th Cir. 2007), *Greenleaf v. Greenleaf*, 2011 WL 4503303 (Mich.App. Sept. 29, 2011), and *Love v. Love*, 33 A.3d 1268 (Pa.Super. 2011).

{¶ 28} In *Motlagh*, the husband, a U.S. citizen, and the wife, a citizen of Tajikistan, married in the U.S. after the wife obtained a K-1 fiancée visa. *Id*. at ¶ 4. As part of that process, the husband executed Form I-864, obligating himself to financially support the wife. *Id*. The husband later filed for legal separation. *Id*. at ¶ 5. The divorce decree entered by the trial court ordered the husband to pay $900 monthly in spousal support to the wife for a period of twenty-four months, as required by Form I-864, and the court retained jurisdiction in applying the I-864 contract in the future. *Id*. at ¶ 6. The trial court noted that the husband

12

was obligated under Form I-864 to ensure that the wife's income did not fall below 125% of the federal poverty line, and likewise, we believe that C.S.S. was obligated to ensure that D.M.'s income did not drop below 125% of the poverty line once the DVCPO was granted. *See id*. The obligation to provide support under Form I-864 in a divorce or DVCPO case, though, represents the threshold of a spouse's obligation, and not necessarily the limit of that obligation, particularly when considering the broad statutory remedies available to a spouse under both the divorce and protection order laws.

{¶ 29} Like the husband's obligation in *Motlagh*, Form I-864 obligated C.S.S. to guarantee support for D.M. at a level of no less than 125 percent of the federal poverty level. It is undisputed that C.S.S. executed Form I-864, agreeing to support D.M. It is also undisputed that, in the parties' consent agreement, C.S.S. agreed to fulfill his contractual duty to support under Form I-864 by paying $1,662.50 per month to D.M. Because C.S.S. had already agreed to support D.M. at 125% of the poverty level in the consent agreement, there was no dispute between the parties as to the applicability of C.S.S.'s support obligation under Form I-864, and the trial court properly found that the terms of the consent agreement fulfilled C.S.S.'s I-864 contractual duty.

{¶ 30} However, C.S.S.'s potential obligations to D.M. under R.C. 3113.31 were not limited by his contractual responsibility under Form I-864. Instead, it was for the trial court, in its discretion, to determine the appropriate remedies for D.M. under the circumstances.

{¶ 31} We conclude that, at this stage, any obligation of C.S.S. to pay the cable bill is moot, as D.M. no longer resides in the marital residence. The trial court acted within its discretion when it modified the DVCPO related to the duration of C.S.S.'s health insurance obligation and determined that C.S.S. had no obligation to provide D.M. with $500 in moving expenses plus utility deposits or a bed for her to sleep on. The trial court had the authority

to craft a DVCPO that was tailored to the particular circumstances of this case. The court was not required to order financial support beyond what was required under Form I-864 so long as the order ensured that D.M.'s need for financial support was met under R.C. 3113.31. While we sympathize with D.M.'s situation, we cannot say that the trial court abused its discretion. D.M.'s assignment of error is overruled.

### V. Conclusion

**{¶ 32}** The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J., and EPLEY, J., concur.

14